UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
TONI CASTELLANO,

        Plaintiff,

  -against-

THE ESTEE LAUDER COMPANIES INC. and
ELC MANAGEMENT LLC,

        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Toni Castellano ("Plaintiff" or "Ms. Castellano"), by and through her undersigned counsel, as and for her Complaint against Defendants The Estee Lauder Companies Inc. and ELC Management LLC (together, "Estee Lauder" or the "Company"), hereby alleges as follows, upon personal knowledge as to herself and her own actions, and otherwise upon information and belief:

## NATURE OF THE ACTION

1. Estee Lauder goes to great lengths to publicly declare itself a champion of women's rights. It loudly touts its gender equality initiatives on its website,[1] promoting the lore that Mrs. Estée Lauder "challenged the status quo" and "built a company based on the principles of equality and women's advancement." Unfortunately, that lofty language is merely a P.R. gloss that does not reflect the reality of working at Estee Lauder today.

2. Plaintiff Toni Castellano was a superstar at Estee Lauder for years, working in the male-dominated construction section of the sprawling Company. And while she regularly received glowing performance reviews—some of which described her as "visionary, innovative, strategic

---

[1] https://www.elcompanies.com/en/news-and-media/newsroom/company-features/2021/womens-equity

and effective" and someone who "achieves win-win outcomes"—she suffered clear gender discrimination at the hands of the Company.

3. Indeed, as described in detail below, the Company terminated Ms. Castellano's employment due to a construction incident that she did not cause, and which was not her responsibility, while the male employees who were actually responsible for the incident were allowed to keep their jobs, and one was even given Ms. Castellano's former responsibilities.

4. Thus, in firing Ms. Castellano for something that was not her fault while allowing the culpable men to continue without incident, the Company illegally discriminated against Ms. Castellano due to her gender. Such blatant discrimination should not be allowed to stand at *any* company, let alone one that holds itself up as a symbol of gender equity.

5. Accordingly, Ms. Castellano bring this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*. ("Title VII") and the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq*. to seek redress for the harm she suffered due to the Company's gender-based discrimination.

## JURISDICTION AND VENUE

6. The Court has federal question jurisdiction over this action because Ms. Castellano assets a cause of action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*. ("Title VII").

7. Jurisdiction over all other claims is within the supplemental jurisdiction of the Court pursuant to 28 USC § 1367.

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants The Estee Lauder Companies Inc. and ELC Management LLC do business in the State of New York and are subject to personal jurisdiction in this District, Plaintiff resided in this District, and a substantial part of the events or omissions giving rise to this action occurred in this District.

## PROCEDURAL REQUIREMENTS

9. Prior to the commencement of this action and within the statutory time period, Ms. Castellano filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

10. On August 4, 2021, Ms. Castellano received a Notice of Right to Sue from the EEOC.

11. This suit is being brought within ninety (90) days of Ms. Castellano's receipt of the Notice of Right to Sue.

12. Any and all other prerequisites to the filing of this action have been met.

13. Following the commencement of this action, a copy of this Complaint will be served on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirement of § 8-502 of the New York City Administrative Code.

## PARTIES

14. Plaintiff Toni Castellano is a female who resides in Rockville Centre, New York.

15. At all relevant times, Defendant The Estee Lauder Companies Inc. was a foreign business corporation organized under the laws of the State of Delaware, was authorized to conduct business within the State of New York, maintained a principal place of business at 7 Corporate Center Dr, Melville, NY, United States, 11747, and with a registered agent for service of process at Corporation Service Company, 80 State Street, Albany, NY, 12207.

16. At all relevant times, Defendant ELC Management LLC was a foreign limited liability company organized under the laws of the State of Delaware, was authorized to conduct business within the State of New York, and maintained a principal place of business at 7 Corporate Center Dr, Melville, NY, United States, 11747.

17. At all relevant times, Defendants The Estee Lauder Companies Inc. and ELC Management LLC were Ms. Castellano's joint employers.[2]

## FACTUAL ALLEGATIONS

A. **Background**

18. Ms. Castellano was hired by the Company in 2014 as a Director of Construction.

19. Ms. Castellano's responsibilities included leadership, management, direction, and administration of the Facilities Department, which includes strategic planning, capital projects, and construction management, with strategic partnerships in environmental health and safety, security, and human resources.

20. Ms. Castellano was an exceptional employee, and during her tenure at the Company, she received several performance-based raises and bonuses.

21. In her second year of employment, Ms. Castellano was identified by the Company as a "high potential" employee.

22. Ms. Castellano also regularly received glowing performance reviews. For example, Ms. Castellano's development plan for fiscal year 2017 states: "For the past 4 years Toni has been extremely instrumental in shaping the Melville 350 facility master planning, renovation and Revitalization." In that same document, Ms. Castellano's primary manager wrote:

> Toni had an Expectional [sic] (EL) FY18. Toni has been excellent with regards to leading the Melville Building Revitalization. She has been both **visionary, innovative, strategic and effective** in tactical execution. Key FY 18 projects completed this year was the Melville Lobby / Hallway totalling [sic] $1.6MM in spend. Toni was also **instrumental** in getting the Phase 1 / Phase 2 Melville 2nd Floor Lab & Front Office project approved. Total spend will be ~$4MM. Toni also collaborated and is co-lead getting approval of a $2MM HVAC / Sustainability CapEx approved. In general, systemically, Toni has been driving the "Melville Building Revitalization" iniative [sic] that was on full display during Melville 50th

---

[2] Upon information and belief, ELC Management LLC was used to process Ms. Castellano's payroll, but Ms. Castellano always believed, and still believes, that her "main" employer was The Estee Lauder Companies Inc.

4

Aniversary [*sic*] celebration. Toni has been a positive role model . . . . (emphasis added).

23. In Ms. Castellano's most recent review (for 2020), her manager David Santiago wrote: "Toni has been a key advocate in challenging the status quo, making sure that the site keeps open multiple options to support growth and expansion . . . ." Mr. Santiago continued: "Toni does a fantastic job working with the One Melvllle [*sic*] stakeholders . . . . [S]he works very collaboratively so that best practice approaches are shared/adopted, and economies of scale are leveraged when possible." Mr. Santiago further stated: "Toni works well with all of the 350 stakeholders so that projects are managed in a way that achieves win-win outcomes balancing the needs of the business and operation, while ensuring her projects can be executed with excellence (on time, on quality, on cost). . . . The execution has been stellar, with Toni driving the improvements . . . ."

B. **The Company Discriminated Against Ms. Castellano On The Basis Of Gender.**

24. Despite Ms. Castellano's exceptional performance, she has been forced to endure excessively harsh disciplinary practices that affected her compensation and eligibility for career-enhancing opportunities within the Company.

25. The Company's misconduct prevented Ms. Castellano from advancing within the Company or being considered for a Senior Director position and, ultimately, led to her wrongful termination.

26. In or around November 2020, Ms. Castellano asked about why she had not been considered for a Senior Director role, and Company representatives told her that they were looking for a "different look and feel," although one senior executive did admit that he believed she should in fact be promoted.

### i. The February 6, 2021 Incident

27. On February 6, 2021, a minor construction incident occurred at a site where the Company was building a lab known as "Cream 5," when a compounding kettle that was being rigged and lifted into a building was dropped on its side by a rigger. No one was injured.

28. The construction portion of this project was substantially complete on February 5, 2021 (the day before the incident), and at that point the Corporate Engineering department took over and was responsible to oversee the rigging and lifting of the kettle into the space.

29. Importantly, Ms. Castellano's role did not include overseeing the rigger or the "lift" that was in process when the incident occurred. All projects that included non-construction equipment (such as the compounding kettle) prior to this incident were overseen by the Corporate Engineering department (of which Adam Stein was the Director).

30. Rather, as the Construction Director, Ms. Castellano's role involved verifying during the lead up to the project that: (i) the site was clear of debris and materials; (ii) utility connections were available; (iii) the exterior site, and designated staging areas (parking lots/driveway) were clear of snow and or vehicles/debris; (iv) vendors were pre-badged and able to access the site; and (v) safety signage was available throughout the site.

31. In addition, Ms. Castellano's role on the day of the incident involved: (i) oversight of a roofing contractor to remove the roof openings; (ii) verifying that the site location for the crane was clear and the work area outside was accessible; (iii) hanging construction signage inside the facility; (iv) providing caution tape to the restricted areas; (v) making sure security was in their requested locations; and (vi) confirming that the third party contracted Site Safety Manger, Danny Mercaldi of Empire Safety, was onsite and attended the safety tool box talk, which included the rig contractor (Keith Machinery) and all required rigging personnel, and the crane operator.

32. In summary, Ms. Castellano's role on the date of the incident was to provide site coverage, employee engagement, and vendor verification of proper crane credentials.

33. However, Ms. Castellano was not in charge of overseeing, managing, or second-guessing the means or methods used by the rigger or crane operator.

34. Rather, that portion of the project was being managed by three men: Adam Stein, Noel Natal, and Daniel Huamane.

35. On the date of the incident, Ms. Castellano arrived at the site at approximately 11:00 a.m.

36. She was not able to access the work area because the driveway was partially obstructed with equipment, and because she could not go into the work area without a hardhat.

37. Therefore, Ms. Castellano sat in her car to observe from a safe distance, and she asked Jen Casey (the Project Manager[3]) to get a hardhat for her.

38. While Ms. Castellano was in her car, she heard a loud noise.

39. Ms. Castellano could not see what happened, but it sounded like something had fallen.

40. Then Ms. Castellano saw several employees—including Adam Stein, Noel Natal, Daniel Huamane, and Daniel Mercaldi (who was the site Safety Manager)—exit from within the building and begin talking to the rigging contactor onsite. None of these individuals should have been inside the building at the time due to the dangerous nature of the work that was ongoing.

41. Ms. Castellano walked over to the area once the crane stopped moving and reviewed the rigging slings, which are strips of nylon specifically rated to carry certain weights.[4]

---

[3] Upon information and belief, Ms. Casey is not employed by the Company. Rather, she is a third-party contractor.
[4] Before any lift, the master rigger would routinely inspect the rigging slings to ensure that they were in proper order, and Ms. Castellano believe he did so in this case.

42. Ms. Castellano observed that the weights were accurate for the load that was to be lifted, and it was suggested that the slings tore due to the sharp edges of the kettle (and not because of any issue with the rating of the slings).

43. This was also noted in the third-party site safety manager's report.

44. At around 1:00 p.m., Ms. Castellano texted her direct supervisor, David Santiago, to report in on the site conditions, wind issues, etc. Ms. Castellano did not include the details of the incident in her text, because she relied on Adam Stein, the Director of Engineering, to provide an End-Of-Day Report, summarizing what had occurred, to David Santiago and Brandy Hebert (Vice President of Engineering).

45. In fact, Ms. Castellano spoke with Mr. Stein after the incident and told him that she had to head to a previously scheduled doctor's appointment, but that she was relying on him to provide an End-Of-Day Report to Mr. Santiago and Ms. Herbert explaining the incident.

46. Ms. Castellano reasonably believed that Mr. Stein did provide such a report.

47. However, upon following up with Mr. Stein via email a few days later, Ms. Castellano requested a copy of the report and was told that it had not been completed.

ii. **In The Aftermath Of The Incident, The Company Improperly Blames Ms. Castellano And Manufactures A Bogus Pretext To Punish Her Far More Harshly Than The More-Culpable Male Employees.**

48. Although Ms. Castellano played no role in the incident and clearly was not at fault, the Company inexplicably placed the blame for the incident squarely on her.

49. The Company advised her that it was going to interview everyone that was on site that day as part of its investigation but, upon information and belief, subsequently chose not to interview the only other female who was present (Ms. Casey).

50. On February 12, the Company conducted a safety meeting, but Ms. Castellano was not invited to attend. The meeting was attended by six men, and one woman (Ms. Casey).

51. On or around February 15, 2021, Ms. Castellano was interviewed about the incident by Sue Berdel.

52. Ms. Berdel asked about whether Ms. Castellano was alone in the car at the time of the incident. Although it is entirely irrelevant to what happened, Ms. Castellano truthfully told Ms. Berdel that Ms. Casey was in the car with Ms. Castellano for a time, but that she had left to go get Ms. Castellano a hardhat when the incident occurred.

53. On or around February 17, 2021, Ms. Castellano was interviewed about the incident by Dom Mosca (a Director of Environmental & Safety). Mr. Mosca also asked about whether Ms. Castellano had been alone in her car, and Ms. Castellano explained to him (as she had told Ms. Berdel) that Ms. Casey was in the car with Ms. Castellano for a time, but that she had left to go get Ms. Castellano a hardhat when the incident occurred.

54. The Company has tried to spin this irrelevant fact into a pretextual argument to support its otherwise-unsupportable decision to terminate Ms. Castellano. Specifically, the Company has argued that Ms. Castellano was "untruthful" because, it claims, she told Mr. Mosca that Ms. Casey was with her, but told Ms. Berdel that Ms. Casey was in the building getting hardhats.

55. However, as set forth above, that argument mischaracterizes Ms. Castellano's statements to Mr. Mosca and Ms. Berdel, in which she explained that Ms. Casey was in the car with Ms. Castellano for a time, but subsequently left to get the hardhats.

56. On February 23, 2021, David Santiago met with Ms. Castellano to give her a "heads up" that an investigation was pending, and had gone "all the way up," and stated how "awful" it was that this incident came on the heels of an unrelated dispute about project spending.

57. During the February 23 meeting, Mr. Santiago intimated that Ms. Castellano should have reported the incident, even though her male counterpart, Mr. Stein (a Director of Engineering and owner of the equipment scope) and his team were onsite and in charge of the lift.

58. And, as stated earlier, Ms. Castellano had to leave the site that day and had specifically requested that Mr. Stein provide the End-Of-Day Report.

59. On March 17, 2021, Ms. Castellano was told by Mr. Santiago and Ms. Berdel that the Company was terminating Ms. Castellano's employment due to the rigging incident, the Company's false allegation that Ms. Castellano was "dishonest" about Ms. Casey being in the car at the time of the incident, and a writeup arising from the unrelated project spending issue.

60. Shockingly, however, none of the men who were actually in charge of the lift were terminated and, in fact, one of them was actually given Ms. Castellano's former responsibilities.

61. Thus, the Company sacrificed Ms. Castellano over something she did not cause, and chose not to take similar action against any of the three male employees who bore the actual responsibility for the incident.

62. The Company's termination of Ms. Castellano's employment was far more severe than the consequences imposed by the Company when other similarly-situated men had work-related issues—including issues substantially more serious than the incident that led to Ms. Castellano's termination.

63. By way of example only, there was recently a scandal at the Company when a male employee, who worked as a compounder for a specific cream/lotion, unilaterally decided (without any approval or even basic testing) to change the formula for the cream/lotion product.

64. This was an extremely dangerous situation, which could have resulted in severe reactions in customers and exposed the Company to enormous liability.

65. Moreover, this individual's actions were intentional, and there is no dispute that he alone was responsible for what happened.

66. Nevertheless, the Company's response to this dangerous and intentional misconduct was to provide the male employee additional training.

67. Upon information and belief, that employee remains employed by the Company.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION
### (Discrimination in Violation of Title VII of the Civil Rights Act of 1964)

68. Ms. Castellano repeats and realleges each of the foregoing paragraphs as if fully set forth hereat.

69. Under Title VII, it is unlawful for "an employer ... to discriminate against any [employee] with respect to ... sex." 42 U.S.C. § 2000e-2(a)(l).

70. The Company has discriminated against Ms. Castellano in the terms and conditions of her employment, by subjecting Ms. Castellano to a hostile work environment, disparate terms and conditions of employment, and ultimately wrongfully terminating her due to her gender.

71. Upon information and belief, the Company replaced Ms. Castellano with a man and, as a result, there are zero female managers in construction.

72. As a result of the conduct described above, Ms. Castellano was subjected to adverse employment actions due to her gender.

73. As a result of the conduct described above, Ms. Castellano suffered lost wages, mental and emotional distress, anxiety, loss of enjoyment of life, injury to her reputation and other damages in an amount to be proven at trial.

74. In addition, the Company's unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Ms. Castellano 's rights, for which Ms. Castellano is entitled to an award of punitive damages.

75. Ms. Castellano is also entitled to recover her costs and attorneys' fees.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Discrimination in Violation of the New York State Human Rights Law,**
**N.Y. Exec. Law § 290 *et seq*.)**

76. Ms. Castellano repeats and realleges each of the foregoing paragraphs as if fully set forth hereat.

77. The Company has discriminated against Ms. Castellano in the terms and conditions of her employment, by subjecting Ms. Castellano to a hostile work environment, disparate terms and conditions of employment, and ultimately wrongfully terminating her due to her gender.

78. As a result of the conduct described above, Ms. Castellano was subjected to adverse employment actions due to her gender.

79. As a result of the conduct described above, Ms. Castellano suffered lost wages, mental and emotional distress, anxiety, loss of enjoyment of life, injury to her reputation and other damages in an amount to be proven at trial.

80. Ms. Castellano is also entitled to recover her costs and attorneys' fees.

**DEMAND FOR JURY TRIAL**

81. Ms. Castellano demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Ms. Castellano respectfully requests that the Court enter judgment in her favor and against the Defendants, jointly and severally, for the following relief:

A. A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate the laws of the United States and the State of New York;

B.　　An award of damages in an amount to be determined at trial, plus applicable interest, to compensate Ms. Castellano for all monetary and economic damages;

C.　　An award of damages in an amount to be determined at trial, plus applicable interest, to compensate Ms. Castellano for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering;

D.　　An awarded to be determined at trial, plus prejudgment interest, to compensate Ms. Castellano for harm to her professional and personal reputations and loss of career fulfillment;

E.　　An award of punitive damages;

F.　　An award of costs that Ms. Castellano has incurred in this action, as well as Ms. Castellano's reasonable attorneys' fees to the fullest extent permitted by law; and

G.　　Such other and further relief as the Court may deem just and proper.


Dated:　　Brooklyn, New York
　　　　　　August 23, 2021

**ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN, FORMATO, FERRARA, WOLF & CARONE, LLP**

 */s/ Justin T. Kelton*
Justin T. Kelton
1 MetroTech Center, Suite 1701
Brooklyn, NY 11201
Tel: (718) 215-5300 x 501
Fax: (718) 215-5304
Email:  jkelton@abramslaw.com
*Attorneys for Plaintiff*
*Toni Castellano*